You have 15 minutes to decide. Good morning, Your Honors. Michael Denver for the appellants. I'd like to reserve three minutes for rebuttal, if I may. Okay. May it please the Court. Appellants agree with the District Court's recitation of the general principle law that banks owe no duties to police depositors. We actually pled that in our complaint. However, appellants' allegations that California Bank and Trust had actual knowledge of IMG's fraud— That's a conclusion. That's not an allegation of fact. Point to the portions of your complaint which specifically show that the bank had knowledge that this was a fraudulent transaction.  Let's start with the solicitation of investors in 2005 by the bank on behalf of IMG, whereby the bank brought investors to provide cash to IMG, and their money was to be used solely to purchase gloves in Asia for domestic resale in the United States. Let's reinforce that fact with the additional fact that the bank actually prepared the investment paperwork and in some cases mortgaged customers' homes and sent the money to IMG purportedly to buy gloves solely in Asia. Perhaps I haven't made myself clear, Mr. Denver, and let me try again. Yes. What I'd like you to do is to point to paragraphs in your complaint which allege under Rule 9, which is what you're suing under because it's a fraud case, specific evidence of actual knowledge by the bank that a Ponzi scheme, not some other fishy business, but a Ponzi scheme was taking place. Okay. So I'm going to do that in three steps if I can. Okay. Okay, the first step, which is the one I just mentioned, it's the knowledge by the bank that it knows investors are providing cash that's supposed to be used only to buy gloves in Asia. And those allegations can be found at paragraphs 26 and 103 to 104, paragraph 2, paragraph 6. Say that again, 26? Yes, 26, 103 to 104, paragraph 2, paragraph 6. I don't. So these are the paragraphs, as I understand, where you allege the bank knows that investor funds were only to be put in gloves, right? Correct, Your Honor. Okay, that's important. Okay. Those paragraphs I referenced are but a few. There are many more, but I think those cover the point. The second point, the facts that would support the inference that the bank knew no gloves were being purchased in Asia or resold domestically. So let's start with, I've got to preface this statement with the admission by the bank, which I think is important in its responsive brief at page 19, that it owed a duty to investigate IMG in relation to its lending obligations, not its depository relationship with IMG, which is what the district court focused on and what the bank focuses on. But once CB&T is a lender of over $20 million to IMG, it owes legal duties to investigate IMG. To whom? To the bank itself, to its shareholders. The bank admits that on page 19 of its brief. But not to your folks? No, no, just a duty to investigate and understand. Because the district court was saying, hey, banks don't owe a duty to police depositors, but this is a lending relationship which carries a whole different set of obligations on the part of the bank, and the bank admits that includes investigating IMG. So getting to the fact now where the bank realizes money is not being sent to Asia and investors are being misled. How would it know? I mean, I'm now getting right there. What are the allegations in your complaint that suggest they know that no money was going to Asia? Okay. So the bank owes the duty to investigate. I understand that. Okay. Let me get to the specific paragraphs that support the question I think that the court is asking me. CB&T held the accounts. It owes the duty to investigate. It can easily do so. For its own purposes. Correct. But, again, what is the allegation that suggests that they knew that there was no funds being sent to buy the gloves? Okay. And if I can, I can walk through a series. I mean, I can find in there where the bank should have known that it was being repaid with investor funds. No, I'm not. To be clear, Your Honor, this is not a should have known. This is the bank knew. Okay. Let's put a knew. Knew it was being repaid with investor funds because it monitored the accounts. I can say that they solicited clients to invest in IMG. They handled the investment paperwork, which seems to me to let them know that this was supposed to be put in foreign gloves. I can say they obtained an assignment of JHMS payments for importing latex gloves, requiring all of them to be deposited in a lockbox at the bank, under the bank's control, to pay down the interest in principle. I can see where you argue it monitored the accounts and actually traced the source of the loan payments to, if you will, the investors. All of that. Before granting extensions, they conduct audits and due diligence. But, again, I'm trying to figure out where do I find and where's your allegation that they knew there was no money going outside to buy gloves? Okay. I have the same question. I might add, Casey, it's not enough to show the bank had a fiduciary duty to investigate or that something fishy was going on. But what, as the District Court pointed out in many places, the complaint simply alleges that CBT had actual knowledge that IMG was breaching its fiduciary duties. Moreover, many of the facts alleged in the pleadings, for instance, that IMG's banking practices were highly suspicious or that CBT granted extensions of the maturity dates, which they did, are insufficient to establish aiding and abetting liability. At best, said the District Court, they show that IMG may have been aware that something was fishy, fishy was going on. But according to Casey, not that IMG had actual knowledge of one of Kuwati's Ponzi schemes. Yeah, and I appreciate the Court bringing up Casey. And I would like to pair it with Benson, which is the case we cited that the bank did not cite, which takes a factual scenario much closer to what we have pled. And Benson holds that plaintiffs must come forward with facts to support the inference of knowledge. And Benson points to the closeness of the relationship, the longevity of the relationship, the investigation and audit, which is exactly what we have alleged here. And I do want to get very quickly and run through some facts that I think are addressing the Court's. I think, I really think you have to respond to Judge Bayh's questions. That's what I want to do. Because I'm giving you credit for stuff he would have made you go through your complaint and do. But there is one part I did never find. I don't know where you get this idea that you pledged they knew that funds were not going to buy the plaintiffs' clothes. So let's look at this in context. I don't want to look at it in context. I want to know from your complaint. Right. That's what Judge Bayh wants to know, too. My apologies. I only am trying to give context because the complaint is pretty thick. But the bank lends the 21.2. It owes the duty to investigate. And then we have facts that demonstrate the bank belatedly did investigate after it had lent the money and it realized, my goodness, we lent $20 million to a fraud. The bank faced the choice of either. No, no, no, no, no, no, no. The bank finds out that some money coming into the bank is coming not from the sale of gloves, not from the sale of inventory, but from another investor. Right? That's what their audit shows. Now, that other investor may be making a bridging loan. It doesn't tell the bank that there are no gloves being bought. Well, when the bank does its investigation, it can see the accounts. No money is going overseas. None. There are no gloves being purchased overseas. And here's another fact that plays with that. CB&T was the beneficiary of nine separate standby letters of credit, pursuant to which it was supposed to provide financing to overseas glove manufacturers or their Asian banks. But the bank knew by 2009. So what you're saying is that there is an allegation in the complaint that the bank had actual knowledge that none of the funds that were being taken out from the bank by I can never pronounce his name. What? One of what? One of quality was actually going overseas. Correct. What's the paragraph? So that's so religious. I apologize. Your Honor, I'm having an issue with my contacts. But, yeah, paragraphs two and six are two of many. No, no, no, not many. Let's not use the word context anymore. Let's be precise. Paragraph two and paragraph six. And they tell us that the bank knew that no money was going overseas to pay for the purchase of the latex gloves. I believe that's correct, Your Honor, although during the break I can go through and find some others. But if I may, there are some additional facts I would like to get to before my time expires. Well, you can go. It's not a good suggestion for appellate counsel to go away from the questions that are being asked by the panel. But if you want to do that, go ahead. No, I don't want to do that. But you read one paragraph that says the bank knew that no money was being used to purchase gloves overseas. And that is paragraph two doesn't quite say that. It says IMG had no income from its purported wholesale import business. You cited paragraph six. Yes, I meant, I think five is my mistake, Your Honor. All right. And what does five say? I mean, the problem that you have, I guess, that Judge Bay is trying to focus on here is that you can suggest that the bank knows it's getting paid by investor funds because it has an account where the funds it's getting paid with are from the investor funds. But the bank is not culpable for not going to find out what resource these funds are coming from, especially when there is a, if you will, a fund that is exactly, it's an income fund, outgo fund, it's a big fund, it's a great big account. Now, I understand that there's a HMS payments that's in a certain lockspok account. And I understand that it knows there that funds coming out of that have to go for interest in principle and no payments ever came from there. But that's the best you got. Well, that's the allegation that there's no gloves actually being resold, which it knows is what investors are being told. Investors are being told, you provide cash, we're going to use your cash to purchase earmarked shipments of gloves overseas, we're going to resell them. So your best allegation you have is that they have an assignment of a JHMS account, which is for the cash importing latex gloves and all of the money made from that have to go in this lockspok account. And because of this lockspok account and no payments ever been made out of there, they then know no gloves have been bought overseas. Is that your best argument? No, they know no gloves are being sold. Right. Okay. We'll give you a couple of minutes for rebuttal. Okay. May it please the Court, my name is Robert McWhorter. I'm on behalf of ZB&A, also known as California Bank and Trust. I'm going to refer to it as CB&T, it's just easier. Your Honors, before I go in and address the actual knowledge argument, I want to raise one issue which is raised in the brief, which the District Court did not address, but this Court, because it's de novo review, can rule on any issue. I want to raise an issue that I think is very simple. In fact, I think it was simple. I think the District Court could have ruled on this issue. And that's the statute of limitations, and I'll briefly deal with that, and then I'll go to the actual knowledge argument. All of the causes of action in this case, except for the securities fraud, which I'll address separately, all of the causes of action are three years or less. It's either three years or two years. Was that argument in your brief? It is in my brief. It is in my brief. I missed that, I guess. Yeah. I did not think about it. So all of the statute of limitations are three years or less, and the securities fraud has a specific statute of limitations, which I'll address in a second. The complaint in this case was filed May 26, 2017. Thus, the claim had to accrue. Therefore, the three years back is May 26, 2014. But the complaint was filed May 26, 2017. If you look at the facts in this case, you had Mr. and Mrs. Evans. They loaned $50,000 January 21, 2014. Mr. Treadway loaned money. It says in the complaint from 2017 to 2014, but if you look at his proof of claim that's in the record, it's actually from September 4, 2007 to December 30, 2013. Mr. Wanakwadi was arrested February 21, 2014, and he pled guilty May 8, 2014. All of that is in the record. Specifically, if you look at pages 449 to 465 in the record, in the appendix. So he pled guilty to wire fraud. And there is nothing in the complaint that relates to events that transpired after Mr. Wanakwadi was arrested. Nothing. Everything at that point, the Ponzi scheme, alleged Ponzi scheme, or his conduct at least was at an end because he had pled guilty. Now, all of the statute limitations are outside of that because that's May 8. So at that point, plaintiffs were put on inquiry notice. And under the Norgat v. Upjohn case, which is 21 Cal 4, 383 and at page 398, a plaintiff discovers a cause of action when he or she at a minimum, quote, suspects that someone has done something wrong to him or her. I understand where you're going. It seems to me that now having reviewed this, what are you going to do with this delayed discovery rule? Well, the delayed discovery issue. So once they are put on inquiry notice, and certainly when Mr. Wanakwadi pled. . . Isn't that a question of fact? Absolutely not in this case, Your Honor, because. . . Why isn't it? I mean, it seems to me that this is the exact place to have a question of fact. And if we're going to go on the summary judgment on a statute of limitations, we ought to send this back to district court to look very carefully at it. Your Honor, if you look at Norgat and you look at the Jolly v. Eli Lilly cases, they establish that all you have to know is you've been wronged. You don't have to necessarily know the identity of the defendant, of the potential defendants. In this case, Your Honor, they had a duty to go out and inquire. And it wasn't that CB&T was hidden from them. It's in the Artley Affidavit. It's in his plea agreement. All the bank accounts of CB&T are specifically identified. This information was readily available to them. They could have gone out and sought this information. The fact that the bankruptcy was filed, the fact that IMG filed bankruptcy, plaintiff uses that as a shield to prevent them from trying to discover the statute of limitations. It actually provided them with an opportunity. Because under the Bankruptcy Code, they had the right to get access to all the documents. They could have taken under, I think it's 707 of the Bankruptcy Code, they have an affirmative, the trustee has an affirmative obligation to provide them documents as creditors. Number two, they could have taken a 2004 examination to inquire into information. They knew about CB&T. At least they should have known because it was available. They didn't do anything. They sat on their rights after Mr. Wanakwadi pled guilty on May 8th and waited more than three years to file their complaint. So in terms of the delayed discovery, they don't plead any facts to suggest delayed discovery. There's no facts to suggest that CB&T somehow prevented them from knowing anything, which they would have to show for some type of, if they were going to allege a fraudulent concealment. There's none of that. There's no facts whatsoever that CB&T did anything after May of 2014. And as to the securities fraud, it's an absolute bar. There's two statute limitations applicable to the second claim for securities fraud. One is a two-year bar. There's no equitable tolling. It's involved the date of the sale of the securities. So January 21st, 2014 was when the Evans invested. That means the statute would have run as a matter of law January 21st, 2016. And the same thing with Mr. Treadway. His last investment was made December 30th, 2013, and that means his statute would have run at the end of 2015. And the other statute applicable has a five-year total bar date, but a two-year after discovery. Again, I would argue that the same analysis applies on that. Do you have any cases that say the statute of limitations on a fraud claim runs as to a plaintiff claiming to be defrauded if his fraudster has pleaded guilty? That's what you're saying now, isn't it? I'm saying that he's put on – he certainly knew that he was wronged, that they knew they were wronged because he pled guilty to the scheme. Why is a plaintiff charged with the knowledge of the fraudster pleading guilty? Does he read the criminal docket of the – Well, in the case – at least for Evans, which is – it's in the record. He filed a witness statement on May 15th in the criminal action for restitution. So Evans filed a declaration in the criminal action saying, I've been defrauded? That I have a right to be – to receive money as restitution in the criminal action. And that was before the guilty plea? That was done – I think that was filed May 15th, if my memory serves me correct. What is that – is that the day of the guilty plea? No, it was May 8th. There was witness statements, I think, for sentencing. So that shows that Evans knew there was a criminal proceeding going on? Yes, Your Honor. And we also attached the articles. It was well-publicized, the fact that he pled guilty. I mean, this gentleman was a well-known person in the community. He owned the Sacramento Capitals, that type of thing. This was not something that was kept from them. What about the other plaintiff besides Evans? I don't recall whether he filed a restitution claim or not. But certainly, Your Honor, the fact that he pled guilty certainly – I wish we would have put him on inquiry notice. Mr. McWhorter, cite me a case that says that a defrauded plaintiff is charged with constructive knowledge of the fraudster pleading guilty. I don't have that case. I didn't think so. Your Honor, let me address the actual knowledge standard for a second. As Your Honor has pointed out, Casey, you must have actual knowledge of a specific wrong, that you have to have intentional participation with knowledge of the object to be obtained, and there's two elements that you have to show, knowledge and intent. You have to know that a tort had been or was to be committed, and you acted with intent to facilitate that. Now, in this case, they have to show that CB&T knew of the false representations, meaning they knew of the representations, they knew they were false. They have to show, in terms of the breach of fiduciary duty, they have to show that the bank knew of the fiduciary status and knowledge that Mr. Wana-Kiwate or IMG's actions was a breach of that. Your Honor, none of that is in the complaint. Well, just a minute. Let's go through that, because that's what we were doing with your counterpart. There is an allegation that your client knew was being repaid with investor funds, because it monitored the accounts. There is an allegation that your client knew of the misconduct, and the misconduct being that you were using these investor funds to put Playtex gloves overseas because your client enlisted bank clients to invest in IMG, that your client handled the investment paperwork. Your client obtained an assignment of the JHMS payments for importing the Playtex gloves, requiring all of them to be deposited into this lockbox, and under your control, that the interest and principal, the only thing that would come out of that lockbox, but never got any payments. Your client monitored the accounts and actually traced the source of the loan repayments of $12.2 million specific to the deposits by investors, and before granting extensions, your client conducted audits and due diligence to demonstrate there was actual evidence that the obligor possessed resources sufficient to provide all of the payments, and that even your client traced one of the payments made by IMG to investor funds deposited in the wholesale account, which then came on November 4, 2009. Then you accepted facially bogus purchase orders to get your $9 million. Immediately after the Bank of America decided that the JHMS line would expire, then you presented those purchase orders to the Bank of America so you could get the $9 million in credit, and then as soon as you could get your loans repaid, the end. Those are his allegations. Now, that doesn't say anything about you having to monitor anything. That just says, based on what you know about what's going in the accounts to pay you, and you knowing what is supposed to be paying you, and it was never that. It was just investor funds. Now, tell me why, then, I should dismiss Count 5. A couple points. First of all, you have to look at this in terms of the context of these plaintiffs. I understand that. Because Mr. and Mrs. Evans made their payments in 2014, a month before Mr. Wanakwani was arrested. At that point, the bank's only a depository institution. There's no allegations that we did anything in 2014. Then if you look at Mr. Treadway, he made deposits from September 2007 until 2014, and if you look at the math, almost all of it, about 1.6 million out of his 2 million, is after the bank is repaid. So in terms of these particular plaintiffs, in terms of these actions, you have to start with that. In terms of— Well, but I guess the problem I have is, but there is already on the bank's records enough allegations here to suggest they know there's no money coming into this to pay the bank because of what this guy says he's doing. It's all coming from investor funds. And none of that is done because you owe any duty to your depositors. All of that is simply because of the duty you owe to yourselves, that you wanted to make sure you got repaid, and after wanting to be sure you got repaid, it just mattered you got it. And you knew very well it wasn't supposed to be out of investor funds. It was supposed to be out of latex gloves funds. Your Honor— I don't know how one can say on this standard, and we're talking about—I mean, the district court said on this standard, I mean, I guess I'm trying to figure out on a motion to dismiss standard how one could say this isn't enough allegation on a motion to dismiss to keep you. Your Honor, you have to go back and look at Casey. I can look at Casey. All I'm looking at now is, it seems to me with Casey, what I'm looking at is, do I know where the money's coming from? If I don't, there can be a lot of fishy stuff going on, and there's no duty required. But if I know where the money's coming from, then Casey says I can go forward. Casey says you have to have specific knowledge of the specific wrong. Well, you do. What is the specific— No funds coming from any gloves. Your Honor— All coming from investor. And you know the investor sales are supposed to be getting gloves outside the United States. What is the specific wrong here? The specific wrong is Mr. Wanakwadi diverting money to himself as part of the Ponzi scheme. That is part of the specific wrong. None of those transactions have anything to do with that. Well, but— Let me ask you this. In the conspiracy to fraud, commit fraud section, they allege there's an illegal agreement between IMG and the bank to terminate the lending relationship in late 2009 to keep IMG's wholesale depository account open and long enough until 2014 for the bank to get fully repaid and then long enough to hide the evidentiary connection between the knowledge of the Ponzi scheme and repayment from it. That's the allegation. Your Honor, that's a conclusion. That's not facts. What do you mean? If you look at the— If you get all these facts and you put that behind that allegation, it makes it pretty specific. Your Honor, in terms of the actions that were specifically alleged that CB&T did, the fact that they had, quote, traced funds— I actually think the tracing relates to, what, $1.9 million, which there's not even any detail about what that tracing is. The solicitation of the bank customers, alleged solicitation, was in 2005, and the preparation of documents I believe they're referring to is simply the fact that the bank gave a loan to the person to make the investment. That doesn't constitute knowledge of a Ponzi scheme. That was before the loans were even made. I mean, that doesn't make any sense as to the bank would think  What about the $1.98 million repayment from IMG to CB&T on November 4, 2009? Shouldn't that have raised a red flag for the CB&T employee because it was traced to an IMG investor? So what you're saying is that because the bank received money from investor money, it should have known that Mr. Iwanakuwate was running a Ponzi scheme? I think that's a jump in logic. Well, that's only because they have an account that says all the money that's supposed to come in to pay you is in this lockbox account, and therefore we know if you get any money in, we're going to get it. And no money ever came in, and they never got it, so the only thing they ever could have got was investment funds, and they know why the investments are being made. Your Honor, with all due respect, I believe the depository account was a general deposit account. But the lockbox account for importing the latex gloves is a lockbox account. It could only come out as payments of interest or principal from Your Honor, that's one transaction. That's not the general account that they're talking about. The 4841 deposit account is a general deposit account. Well, I understand what you're talking about. So if the bank received money and the deposits were made, how is the bank supposed to know if it received payment, if it was from investor money? I understand that there's an allegation that $1.98 million was traced, but how does the bank know that that investor didn't authorize the payment? How do they know that that specific payment was not allowed to be paid? But, again, we're on a motion to dismiss. But they have to plead facts. Your Honor, it is not for a fraud claim. To get to the courtroom door, they have to meet minimum pleading requirements. They have to plead fraud with specificity, because it is not enough to plead a fraud claim and say, we'll discover it and plead facts later. It is their burden to come before they get to the courtroom door and plead facts with specificity. They have not pled facts that the bank had actual knowledge that Mr. Wanakwadi IMG was running a Ponzi scheme. It's just not there, as this Court pointed out. And the paragraphs that he identifies, paragraphs 229, 102, 103, what do those point to? They point to the October 2009 letter, and what does that say? It just simply says they're not going to renew their line of credit because the line of credit's not revolving. The fact that a line of credit's not revolving doesn't mean that the bank knew there was a Ponzi scheme. It happens all the time where banks decide not to extend a line of credit because a line of credit's not revolving. That doesn't mean that the ---- What does revolving mean? That it's not being paid off? Revolving means that the bank, that the balance is going down and that it's going down and then more money's being loaned, so it revolves. So in essence, if you think of the deposit amount, it's being repaid. In other words, here the money's drawn, but the balance is not going down. It's not revolving. It's a common banking term, but that doesn't mean that the bank knew that there was a ---- They're loaning more money, but the balance is going down? No. In a revolving line of credit, typically, someone borrows money. Say you borrow $100. And you borrow the $100 and you keep making payments, and that balance goes down. It goes down to, say, $10. And then they decide that they need to borrow more money, so they borrow another $90 and it goes back up to $100. It's revolving. Banks, when they're typically making, when they're looking at whether to renew a line of credit, that is something that banks look at is whether it's revolving or not. In other words, they're getting more business. Right. All right. Thank you very much. I'm taking you past your time. Thank you, Your Honor. I'm going to try to briefly address the question about the paragraphs, and then I do want to respond to a comment counsel just made. Paragraph 102 of the complaint states, due to its intimate connections with IMG, as well as its underwriting and diligence in relation to its own financing of IMG's affairs, CB&T had actual knowledge that IMG was not actually importing latex gloves. How? How did they do that? You don't state the facts of how. By the underwriting that it owed in relation to the $20-plus million that it had loaned to the bank. When the bank realized that the security behind the $9 million loan in 2009 was disintegrating, and that security is the reason the bank was lax in its diligence to begin with, the bank lent the money without knowing there was a fraud. I just want to point that out. He made that case. I agree with it. The bank did not lend knowing IMG was a fraud. It lent the money without doing the due diligence because it was lazy, because the security of the federal government was— Clients aren't entitled to due diligence. Pardon me? Your clients aren't entitled to due diligence. They don't have a negligence cause of action. No, no, no. I'm talking about knowledge on the part of the bank. So the bank sees the security of the federal government going away in 2009, and the bank says, uh-oh, we never really looked at this. Now we may not get repaid. Let's take a look. They look at the accounts. They can see no money going overseas. That's the underwriting I'm talking about in paragraph 102. Same in paragraph 113, where I say, based on CB&T's knowledge of IMG's quote-unquote business, it's knowledge that no wholesale gloves were being imported, and it's knowledge that the JHMS was not paying for any purported sales because the lockbox account remained empty, that paragraph. What we are describing is a situation where the bank lent $20 million without doing the due diligence so it didn't know there was a fraud, but then when the security started to evaporate, the bank said, uh-oh, we've got a problem. They look into it. They can see $200 million-plus of investor money coming in, none of it going overseas, all of it being reorganized and redistributed back to Californians, a Ponzi scheme. That's in 2009. The bank immediately sends the letter that counsel mentions, which he says is exculpatory, where they cut off their lending, three days after they get repaid the $9 million. So let's look at what happened in that three days. The bank goes to Wanakwadi, goes to IMG, desperate because it knows that the federal government guarantee of the largest loan, the $9 million loan, is falling apart. And the bank says, we're in trouble. Give us your purchase orders. And the bank already knows from looking at the accounts that no money is going overseas. The bank takes pieces of paper that purport to represent purchases of gloves overseas that the bank knows did not happen, gives those pieces of paper to Bank of America to draw down $9 million on the standby letter of credit and get repaid. Mr. Denver, your basis for saying that the IMG was not actually importing, that CBT had actual knowledge that IMG was not actually importing latex gloves, as far as I can see it, is based on the following factual allegation. Due to its intimate connection with IMG, as well as its underwriting and diligence in relation to its own financing. Correct. You're not telling me the facts upon which they learned that the gloves weren't being come in. You're using sort of an abstraction. Let me just cut to it. I think you might be right. Maybe this complaint is so detailed that the conclusions, the inferences are not stated. Maybe what I should have done is written a complaint stating the inferences, but I don't think that's what Benson required me to do, but I can do that. And I do think it was an abuse by the court to dismiss without a grant of leave to amend when it had in the record before it the 79-page declaration from FBI agent Artley and the bankruptcy trustee information, which details the financial shenanigans the bank went through in order to get repaid. And I do want to comment that counsel says, hey, it's no big deal if we got paid a little bit with investor funds. They have no claim based on that. I take big issue with that. The bank knew that investor funds were supposed to go to Asia and only to Asia to buy gloves. The bank traces back repayments of its own loans to investors. I don't care if it's a dollar. If the bank has taken money that it knows was entrusted to IMG to buy gloves, how can the bank turn a blind eye and say, yeah, pay me with that dollar? And it wasn't a dollar. It was millions of dollars. It was actually $21.2 million. What are your factual allegations that show the bank had actual knowledge that no money was being exported to Asia to pay for latex gloves? Where is that? Well, I cited two paragraphs. Cite them again. Okay. 113 and 102. And those are statements that the bank's underwriting. And I just want to be clear. The first and easiest step that the bank could take in its underwriting was look at the accounts that it controlled. It can see all this money coming in and none of it going overseas. But if the man running this organization didn't make checks on CB&T to Asian latex glove manufacturers but simply took out money that he may have sent otherwise, then the bank knows that the gloves are not being bought. No, and I'm not sure I understood that. But what I'm saying is the bank can look at the accounts, see $200 million coming in from investors. And the bank, as he concedes, knew in 2005 all that money was to go overseas. It can see none of it's going overseas. It's just going back to California. Your unspoken premise is that it knows the money's not going overseas because the man who pleaded guilty is taking it out of the bank. It doesn't know what he's doing with it, but they know it's not going overseas. Where's your allegation that puts those things together? If it goes to Mr. Wanigatumi, it can't go overseas. Where's that allegation? Oh, you mean like if he's – because they're sending out – they're taking in large chunks of money and they're sending out thousands of $50 checks, $100 checks. That's not buying gloves through a middleman. So they know something fishy is going on. No, they know that the investor funds are supposed to be used to buy gloves in Asia and none of it's going to Asia. It's going to repay the people who had deposited earlier. What did the purchase order show? The bank's a lender of $21.2 million. It is paying attention. What did the purchase order show? The purchase order showed – okay, good question. Because the bank has, in the complainant details, the materials that the bank has, including the operating agreement, which specify the way that glove purchases were supposed to happen. And they included certain terms, bills of lading, and those were not tracking at all with the glove purchase orders that the bank handed off to B of A to get repaid its $9 million. No – it was apples and oranges. Also, the bank knows that the nine slots in its favor were supposed to be used by it to buy gloves overseas, and it wasn't doing that. So the bank knows not only is investor funds coming in at huge increments, which it knows they're supposed to buy. I mean, we're talking containers, shipment containers. We're not talking a couple of boxes of gloves. These people are putting in millions of dollars, and all of that money is supposed to go to buy a ship full of gloves that's going to come over to the United States and be sold to the VA. Instead, $1,000 to Mr. Smith, $2,500 to Diane Keating, or, you know, just making up names. Thousands of tiny checks back to Californians. The bank is doing its due diligence because it sees the security that it was relying on when it made these loans is disintegrating. That's 2009. It then recoups all of its money from that moment in time all the way up until 2011. It then leaves the accounts open for three additional years, which counsel claims is exculpatory. He points to that and says, oh, we wouldn't have left the account open for another three years if we had known it was a fraud. That must mean we didn't know it was a fraud. No, that supposed inference is totally incompatible with the other known facts of the case. The much more reasonable inference under Benson is that the bank knew IMG, like all Ponzi schemes, would collapse, and it was just hoping that the thing would ride out long enough so that the distance in time between its misconduct and the inevitable bankruptcy would be big enough so the trustee would not connect the dots and come back to the bank seeking to claw back the money. All right. Thank you very much, Mr. Denver. And we thank counsel for their interesting presentation. And that will conclude our calendar for today, and we will stand in recess until 9 o'clock tomorrow morning. All rise.
judges: Hawkins, M. Smith Jr., Vratil